UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

JOHN BOWLES,

                                        Plaintiff,


                    v.                                          5:05-CV-266
                                                                (C.J. Mordue)

COMMISSIONER OF SOCIAL
SECURITY,

                                        Defendant.

_____

APPEARANCES:                            OF COUNSEL:

McMAHON, KUBLICK LAW FIRM               JENNIFER GALE SMITH, ESQ.
Attorneys for Plaintiff


GLENN T. SUDDABY                        WILLIAM H. PEASE
United States Attorney for the          Assistant U.S. Attorney
 Northern District of New York
Attorney for Defendant


GUSTAVE J. DI BIANCO, Magistrate Judge

## REPORT and RECOMMENDATION

Plaintiff commenced this action pursuant to 42 U.S.C. § 405(g) to review the

final decision of the Commissioner of Social Security, which denied plaintiff's

application for Social Security Disability Benefits.

## PROCEDURAL HISTORY

Plaintiff "protectively"[1] filed an application for Disability Insurance Benefits

_____

[1] The term "protective filing" refers to a filing date that is established before the agency
actually receives a written application for benefits.  A protective filing date is established in various

1

and Supplemental Security Income (SSI) on September 8, 2003, alleging a disability onset date of June 1, 2000. (Administrative Transcript ("T") at 15, 73-78, 525-28). The application was denied. (T. 58-61). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was held on August 23, 2004. (T. 526-60).

On December 3, 2004, the ALJ issued a decision, denying plaintiff's applications for disability insurance benefits and SSI. (T. 15-21). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on February 3, 2005. (T. 6-8).

## CONTENTIONS

The plaintiff makes the following claims:

1.    The ALJ failed to accord proper weight to the opinion of plaintiff's treating physician. Plaintiff's Brief at 5-8.

2.    The ALJ failed to properly assess plaintiff's allegations of pain. Brief at 10.

3.    The ALJ's opinion is not supported by substantial evidence. Brief at 9.

Plaintiff argues for reversal of the administrative decision and calculation of benefits. Plaintiff's Brief at 14. Defendant argues that the Commissioner's decision is supported by substantial evidence and that the complaint should be dismissed.

---

ways, outlined in the Social Security Program Operations Manual (POMS). *See Carpenter v. Barnhart*, CV-02-828, 2003 U.S. Dist. LEXIS 15661, *11 (E.D.N.Y. Aug. 29, 2003). In this case, the ALJ noted in his opinion that plaintiff's protective filing date was September 8, 2003. (T. 15). *See also* (T. 104, 524). Plaintiff's written applications were signed on September 17, 2003 and received by the agency on September 22, 2003. (T. 73-78)(disability insurance benefits); (T. 525-28)(SSI).

2

## FACTS

1. **Non-Medical Evidence**

Plaintiff was born on June 4, 1956 and was 48 years old at the time of the ALJ hearing in 2004. From 1973 to 1990, plaintiff worked as a roofer. (T. 104). Plaintiff previously applied for disability benefits and was found disabled, beginning in September 1992.[2] (T. 37). He began receiving Social Security benefits in 1992, based upon his substance abuse and a personality disorder. (T. 37).

Plaintiff received benefits until 1996, when he was notified by the Social Security Administration that he was no longer disabled. (T. 37). Plaintiff asked for reconsideration of the decision to terminate his benefits, but reconsideration was denied. (T. 37). On April 2, 1998, an ALJ found that plaintiff's disability had ended as of January 1996, based upon medical improvement in his mental condition and plaintiff's physical ability to perform light work. (T. 37-44). The ALJ's decision was affirmed by the Appeals Council on June 8, 2000. (T. 55-56). Plaintiff did not bring a Federal Court action based on the termination decision.[3]

After the decision terminating plaintiff's benefits, plaintiff worked part-time as a roofer during the summers of 2001 (June to October) , 2002 (June to October), and

---

[2] This prior application is not available in the current transcript, however, the transcript citations are to the previous ALJ's decision that has been included in the record.

[3] The court notes that on ***June 27, 2000***, plaintiff filed an application for SSI only which was denied initially on December 6, 2000. (T. 516-18, 519). No appeal of any kind was taken from the initial denial.

2003 (July to August).  (T. 123-24).[4]  In a questionnaire dated September 17, 2003, plaintiff stated that he was unable to continue working as a roofer because he became "very fatigued." (T. 125).  Plaintiff stated that since roofing work was "seasonal", he received unemployment benefits during some of the months he did not work. (T. 125).

In 2000, Plaintiff indicated, on a Disability Determination Questionnaire, that he cooked and shopped. (T. 112).  At the August 23, 2004 hearing, plaintiff stated that he left the house about once a day and could walk two blocks to a store. (T. 546-47).  Plaintiff testified that he became fatigued and would lie down for five hours out of an average eight hour day. (T. 544).

Plaintiff's high school education is somewhat unclear.  At the hearing, plaintiff testified that he was one credit short of graduating from high school, and that he was in special education. (T. 539-40).  Two examining psychiatrists reported that plaintiff attended regular classes during his schooling. (T. 197, 308).  Additionally, on June 27, 2000, plaintiff completed a disability report indicating that he took "regular" classes. (T. 101).

## 2.   **Medical Evidence**

Plaintiff has an extensive medical history.  In 1992, plaintiff suffered a pelvic fracture as a result of a car accident. (T. 273).  Two years later, plaintiff had an operation to remove an osteoma of the right hip.  (T. 273).  From 1994 to 1997, plaintiff underwent two additional surgeries on the right hip.  (T. 273).  In both 2001

---

[4]Although plaintiff testified that he last worked in August of 2003, (T. 541), in another part of the record, plaintiff stated that he worked as a roofer in **2004**.  (T. 174).

4

and 2002, plaintiff had a right greater trochanter bursectomy performed. (T. 273).

Plaintiff has also been treated for depression numerous times. (T. 303).  In plaintiff's

current application, he lists a variety of impairments that allegedly prevented him from

working, beginning June 1, 2000. (T. 144).  These impairments include memory loss

due to a drug overdose; Hepatitis C; chronic right hip bursitis; arthritis of the spine;

chronic sinusitis; chronic depression and anxiety; liver problems; stomach lining

problems; and emphysema. (T. 144).

### A.  Treating Orthopedic Physicians

From 1997 until May of 2003, plaintiff was treated for his hip and back

impairments by Dr. Stephen C. Robinson, an orthopedic specialist with Syracuse

Orthopedic Specialists, Inc (SOS), formerly University Orthopedics and Sports

Medicine, P.C.[5] (T. 189-96, 271-72, 273-79; 387).  The record also contains reports

signed by Dr. Glenn B. Axelrod, another orthopedic specialist associated with Dr.

Robinson. (T. 293A-95; 296-98; 299).

The court notes that some of the SOS medical reports are also signed by Amy

Gemelli, a Physician's Assistant (PA). (T. 293A-95; 296-98; 299; 299A, 300).  On

most of the reports signed by PA Gemelli, either Dr. Robinson's name, Dr. Axelrod's

name, or both doctors' names appear in the report as "supervising" or "reviewing"

physicians, while PA Gemelli's name appears at the top of the report, listed as the

"Provider."  (T. 293A-95; 296-98; 299).  However, the SOS reports dated July 15,

---

[5] *See* T. 196 (Dr. Robinson's American Medical Ass'n (AMA) listing).

2002 and August 26, 2002 appear to be signed only by PA Gemelli. (T. 299A, 300). Although in plaintiff's application for Social Security benefits, he lists Amy Gemelli as an "MD", she is clearly not a medical doctor. *Compare* (T. 147) *with* (T. 293A-95).

 Dr. Robinson's reports begin on June 13, 1997, although it is clear from the June 13, 1997 report that it was not the first time that he had examined plaintiff. (T. 195). Dr. Robinson specifically stated that plaintiff was "in" for a "follow up" examination. (T. 195). Plaintiff was complaining of pain over his right hip area, over the iliac crest and radiating from his back. *Id.* Upon physical examination, Dr. Robinson noted that plaintiff was somewhat tender in the lumbar spine and "slightly tender over the operative site over the greater trochanter."[6] (T. 195). Forward flexion was "fingertips to knees," and side bends were to fifteen degrees with "some mild low back pain." (T. 195).

Dr. Robinson's diagnosis stated that the "questionable" right gluteal and pelvic pain was due to degenerative disc and joint disease. Dr. Robinson prescribed a trial of Naprelan and recommended that plaintiff attend physical therapy. (T. 195). On September 8, 1997, Dr. Robinson diagnosed the plaintiff with lumbar radicular syndrome and requested a lumbar Magnetic Resonance Imaging (MRI) scan. (T. 194).

---

[6] Dr. Robinson refers to the "operative site." (T. 195). Although no actual records of plaintiff's 1997 surgery appear in the transcript, in a November 6, 2002 History and Physical report, Dr. Robinson mentions that an osteoma was removed from plaintiff's right hip in 1994, and then plaintiff appeared to have had other surgery "with hardware" that was removed in 1997. (T. 273). Dr. Robinson's June 13, 1997 report may have been referring to the 1997 surgical removal of "hardware" from plaintiff's hip. There is also an x-ray report in the record, indicating that on January 22, *1996*, plaintiff was "status post removal of right hip compression screw and side plate." (T. 198). It is thus, unclear what the exact dates are, but this is not relevant to the decision in this case.

Dr. Robinson reviewed the MRI and found that the results were "essentially within normal limits." (T. 193).

Dr. Robinson's next report is dated September 20, 1999, almost two years later and Dr. Robinson's diagnosis was chronic trochanteric bursitis. (T. 192). The September 1999 report states that plaintiff was complaining of pain in the lateral aspect of his right hip, similar to the pain he had previously when he was diagnosed with the trochanteric bursitis. (T. 192). Plaintiff told Dr. Robinson that nine epidural injections had not given plaintiff "lasting relief." (T. 192). During the September 1999 examination, Dr. Robinson found that plaintiff was tender over the right greater trochanter, but that he had "good range of motion of the right hip." (T. 192). Dr. Robinson recommended Vioxx and stated that if plaintiff's symptoms failed to improve, the doctor would consider another steroid injection. (T. 192).

In January, March, and May of 2000, Dr. Robinson reported that plaintiff had flare ups of the greater trochanteric bursitis. (T. 189-91). In March 2000, Dr. Robinson noted that there was "no swelling or erythema over this area" and prescribed Ultram for the pain. (T. 190). In May 2000, Dr. Robinson concluded that plaintiff had "adequate internal rotation [of the right hip]," supple calves and "no subjective sensory deficit." (T. 189). Dr. Robinson injected plaintiff's hip with Xylocaine and Depo-Medrol. (T. 189).

On November 6, 2002, Dr. Robinson stated that plaintiff had a right greater trochanter bursectomy in March of 2001 and had been "doing well until January 2002" when plaintiff's hip pain returned. (T. 273). Dr. Robinson found a "small sub-

7

chondral cyst at the anteromedial femoral head," (T. 279), and, on November 13, 2002, plaintiff "underwent excision of bone spurs and bursa of the right hip." (T. 271). Dr. Robinson noted that at the time of plaintiff's discharge on November 14, 2002, he was "ambulating well." (T. 271).

On March 3, 2003, the SOS report[7] indicates that plaintiff was in no acute distress, did not walk with a limp, had no tenderness over the bursa, and had full range of motion of the hips bilaterally. (T. 297). Plaintiff told PA Gemelli that he wanted to "hold off" on the hip injection until his next appointment. (T. 297). The report ended by stating that plaintiff was "temporarily TOTALLY disabled." (T. 297). On May 2, 2003, the SOS report, signed by both Dr Axelrod and PA Gemelli states that plaintif still ambulated well, without a limp. (T. 294). Plaintiff had some tenderness over the greater trochanter bursa, and he received an injection of Depo Medrol and Xylocaine in that area. (T. 294).

The May 2, 2003 report also stated, however, that Medicaid would no longer cover continued care at SOS, thus, it was determined that plaintiff would continue his pain management at the "Pain Center," and that his primary care physician would continue his medical care. (T. 294-95). The May 2, 2003 report also stated that plaintiff was "temporarily TOTALLY disabled." (T. 295). The May 2, 2003 report

---

[7] It is unclear who actually examined plaintiff on this date. As stated above, the "provider" is listed as PA Amy Gemelli, however, Dr. Robinson's name appears under the heading "MD Review", and Dr. Axelrod is listed as "[s]upervising physician for today's visit." (T. 297). It does appear that the examiner was PA Gemelli. Regardless of the signatures and who actually examined plaintiff, the doctors appear to have approved the report.

also contains a list of "current" medications taken by plaintiff including Darvocet;[8] Apap/propoxyphene; Celebrex;[9] Protonix;[10] and Ultracet.[11] (T. 293A).

## B. St. Joseph's Hospital and Health Center - Orthopedic Care

As stated in the May 2, 2003 SOS report, plaintiff's hip treatment was going to be continued by his primary care physicians. (T. 295). Plaintiff obtained his primary care at St. Joseph's Hospital and Health Center Primary Care Center. In addition to his family practice physician at St. Joseph's Primary Care Center, plaintiff attended the Orthopedic Clinic, both for his hip injury and for a February 2003 hand injury that plaintiff suffered. At the Orthopedic Clinic, plaintiff was examined for his hip by Dr. Robinson; Dr. Mario Pereira; Dr. Jeffrey Christenson; and Dr. David Lisle.[12] The record also contains reports authored by Dr. Anne Calkins; Dr. William Zeiner; and Dr. Pamela Eaton.[13] Plaintiff received emergency room care for his hip and hand

---

[8] Darvocet is a narcotic pain reliever, used for mild to moderate pain. PHYSICIANS DESK REFERENCE (PDR), 3497 (60th Ed. 2006).

[9] Celebrex is a non-steroidal anti-inflammatory pain reliever. PDR, at 3130-31.

[10] Protonix is a gastric medication used for esophagitis. PDR, at 3466-67.

[11] Ultracet is a combination of tramadol (a synthetic opiate) and acetaminophen that is used for the short term management of acute pain. PDR at 2462.

[12] Plaintiff was also examined in the Orthopedic Clinic by Dr. Seth Greenky; Dr. Warren Wulfe; and Dr. Michael Anvari. (T. 420, 436, 431). These examinations, however, were of plaintiff's finger laceration that he sustained on February 20, 2003 when he fell off of the roof while shoveling snow. *See also* (T. 494). The finger injury itself is not relevant to plaintiff's disability decision.

[13] There are other medical reports in the record from St. Joseph's Primary Care center, written by Dr. Timothy Weise; Dr. William Richardson; and Dr. Bruce Kuntz. (T. 177-88). These reports predate plaintiff's claimed onset date, and will be mentioned only as they are relevant to plaintiff's medical history and current claims.

injuries from Dr. Zeiner; Dr. Calkins; and Dr. Eaton.

On February 20, 2003, William Zeiner, M.D. treated plaintiff for a hand injury that plaintiff sustained after falling off a roof that he was shoveling to remove snow. (T. 291). On December 8, 2003, Dr. Robinson examined plaintiff at the Orthopedic Clinic for increased pain in his right hip. (T. 387). Plaintiff stated that he did not remember any new injury to the hip, but stated that he had been sliding in the snow with his kids. (T. 387). Dr. Robinson saw no swelling or erythema of the hip and that the hip had good range of motion with "minimal discomfort."[14] (T. 387). On January 5, 2004, plaintiff went to the Orthopedic Clinic, complaining of pain in his hip and was treated by Dr. Lisle. (T. 373). Dr. Lisle noted that plaintiff had recurrent trochanteric bursitis for which plaintiff was getting only mild benefit from anti-inflammatories, and was requiring "large doses" of Darvocet daily. (T. 373). Dr. Lisle gave plaintiff an injection of lidocaine and Depo-Medrol. *Id.* Dr. Lisle stated that plaintiff was in no acute distress, and his right hip showed no swelling, erythema, or deformity. Plaintiff was "mildly" tender to deep palpation in the trochanteric region, and had a "full range of motion with minimal tenderness at the extremes." (T. 373).

On February 2, 2004, plaintiff went to the Orthopedic Clinic and was treated by Dr. Christenson. (T. 367). Plaintiff was again complaining of right hip pain. Dr. Christenson found no acute distress, no swelling of the hip, and only mild tenderness over the bursa. *Id.* Flexion was "complete," and extension was to 90 degrees, with

---

[14] This is the same Dr. Robinson who was plaintiff's treating physician at SOS, however, the December 8, 2003 examination was not in Dr. Robinson's capacity as a physician at SOS, but as a physician at the St. Joseph's Orthopedic Clinic.

"mild limitation" to about 25 degrees. (T. 367).  Internal and external rotation of the hip produced "mild discomfort." *Id.*  Dr. Christenson stated that plaintiff's x-rays were normal, and that he would "refer [plaintiff] to Pain Management." *Id.*

Dr. Christenson also decided to change plaintiff's medications from Mobic[15] and Darvocet to Lortab.[16]  Dr. Christenson commented that plaintiff's Darvocet dosage "seem[ed] to be high." (T. 367).  Plaintiff was advised that he should wean himself from the pills and was not given any refills with the new prescriptions. *Id.*  Dr. Christenson also stated that plaintiff should return in "four to six weeks." (T. 367).

On February 15, 2004, plaintiff went to the Emergency Room and was treated by Dr. Eaton, who stated that plaintiff had an "acute exacerbation of chronic right hip pain." (T. 464).  Dr. Eaton found some tenderness to palpation in the right trochanteric region, but plaintiff had "full" range of motion.  Dr. Eaton noted that plaintiff had his medications recently been changed, and although the doctor had prescribed that plaintiff take the Lortab twice a day, plaintiff stated that the dosage did not work, and admitted that he was taking one pill every four hours. (T.  464).  Dr. Eaton appears to have given plaintiff a prescription for Vicodin.[17] *Id.*

On February 18, 2004, plaintiff went back to the Emergency Room because of his chronic hip pain and was treated by Dr. Calkins. (T. 476).  The notation on

---

[15] Mobic is a non-steroidal anti-inflammatory. PDR, at 893-94.

[16] Lortab is hydrocodone and acetaminophen, an opioid analgesic, used for moderate to moderately severe pain. PDR, at 3315.

[17] Vicodin is hydrocodone and acetaminophen, an opioid analgesic, also used for moderate to moderately severe pain. PDR, at 530.

plaintiff's report states that plaintiff had "right hip pain" and "needs medication."  Dr. Calkins noted that plaintiff was sitting and in "some" discomfort, but "moderate at best." (T. 476).  Plaintiff's upper back was "nontender," but there was mild bilateral sacral tenderness." *Id.*  There was also some tenderness over the right femoral head. *Id.*  Plaintiff had a positive Straight Leg Raising test on the right and an increase in discomfort on internal and external rotation of the hip.  However, sensation and motor function were intact. (T. 476).  Dr. Calkins gave plaintiff a prescription for hydrocodone as well as Mobic and told plaintiff to follow up with the Orthopedic Clinic as planned. (T. 476).

On February 23, 2004, plaintiff had an appointment at the Orthopedic Clinic and was examined by Dr. Periera. (T. 361).  Dr. Periera found that plaintiff had "point tenderness over the greater trochanter and over the posterior aspect of his femur. (T. 361).  Plaintiff was neurovascularly intact.  The strength in his lower extremity was limited secondary to the pain in his right hip, and "resisted strength" testing of the quadriceps and hamstrings caused aggravation of right hip pain. (T. 361).  Dr. Periera stated that plaintiff should keep his "Pain Clinic" appointment and return to the Orthopedic Clinic after that. (T. 361).  Dr. Periera stated that there was nothing more to offer plaintiff at that point, but that he should continue with his current pain medication. *Id.*

Plaintiff returned to the Emergency Room for his hip and was treated by Dr. Eaton on May 3, 2004. (T. 467-68).  Plaintiff told Dr. Eaton that he had been taking Darvocet, but because his pain had gotten worse, plaintiff believed that a prescription

for Vicodin would be better than the Darvocet. (T. 467). The physical examination of plaintiff showed a decreased range of motion of the right knee as well as the right hip with internal rotation of the right hip. (T. 467). Dr. Eaton gave plaintiff a prescription for Vicodin, and told him to follow up with his orthopedist or his primary care physician within the next two to three days. (T. 468).

On May 10, 2004, Plaintiff went to the Emergency Room again complaining of "hip pain." (T. 455). Plaintiff was again examined by Dr. Eaton, who stated that she had given plaintiff narcotic medication a few days before and told plaintiff to follow up with his primary care physician or the "ortho clinic." (T. 455). Plaintiff stated that he was frustrated with the "ortho clinic" and stated that he wanted Vicodin for his pain control. (T. 455). Physical examination of plaintiff revealed "diffuse" pain to palpation at the right hip, however, plaintiff had "***full range of motion with no pain to movement***." (T. 455).

Dr. Eaton stated that she reviewed plaintiff's chart and noted that he had been denied pain medication by the Family Health Center and was instead referred to a pain specialist. (T. 455). Dr. Eaton told plaintiff that he really should be following up with the "ortho clinic" as originally planned. (T. 455-56). Dr. Eaton refused to give the plaintiff Vicodin and instead prescribed Celebrex. (T. 455-56). Plaintiff was also advised to continue taking his Darvocet. Plaintiff became "irate" and "very angry." (T. 456). Plaintiff used vulgar language and then left without receiving his Celebrex prescription. (T. 456). Dr. Eaton stated that plaintiff was exhibiting "drug-seeking behavior." (T. 456).

Plaintiff was examined by various doctors when he went to the Primary Care Center, however, Dr. Christina Yambo and Dr. Mariessa Hales, family practice physicians appear to have examined plaintiff most often. *See* (T. 338-501).  It appears that Dr. Hales treated plaintiff in the early part of 2003, while Dr. Yambo began treating plaintiff more often after July of 2003.  Because these doctors are Primary Heath Care Providers, plaintiff's reports are not confined to one illness or impairment, but cover a variety of plaintiff's complaints.  On March 21, 2003, Dr. Hales noted plaintiff's history of right hip pain, but stated that this impairment was being "followed by orthopedics." (T. 422-23).  On May 12, 2003, Dr. Hales noted that plaintiff had "lost" his orthopedist because of insurance issues, but that Dr. Hales would refer plaintiff to another orthopedist. (T. 411).  Dr. Hales also mentioned the "pain management clinic." *Id.*

Dr. Yambo's first report, dated July 23, 2003 does not even mention plaintiff's hip. (T. 398-99).  On October 16, 2003, Dr. Yambo stated that plaintiff had come in for an "f/u" (follow up) of his medications. (T. 393).  Dr. Yambo stated that plaintiff could not get pain medications from Dr. Robinson any more, that he had "just lost his job," and that he had still been unable to obtain an appointment at the Pain Clinic. (T. 393).  Dr. Yambo stated that she would prescribe Vicodin for plaintiff, but could not continue to do so because she had ***never treated plaintiff's right hip*** and that his hip pain was "an issue for Orthopedics." (T. 393).  Dr. Yambo's December 15, 2003 report did not even mention plaintiff's hip problem. (T. 382-83).

On December 31, 2003, Dr. Yambo wrote an addendum to her December 29,

14

2003 report. (T. 378-79). In this addendum, Dr. Yambo stated that she was again referring plaintiff to the "ortho clinic" and that she would not be prescribing any more Darvocet for plaintiff because she was "***not taking care of his hip pain***." (T. 379) (emphasis added). On February 20, 2004, Dr. Yambo completed an "Ability to do Work-Related Activities (Physical)" assessment. (T. 334-37). Dr. Yambo stated that plaintiff could occasionally and frequently lift ten pounds, could stand for less than two hours in an 8-hour workday, could sit for less than six hours in an 8-hour workday, and would have limited pushing and pulling ability with his lower extremities. (T. 335). Dr. Yambo also indicated that Plaintiff could occasionally climb and frequently balance, kneel, crouch, crawl and stoop. (T. 335). Dr. Yambo stated that these conclusions were based upon plaintiff's chronic bursitis. (T. 335). On March 30, 2004, however, Dr. Yambo stated that plaintiff told her that he did not have his hip pain any more or that it had gotten to the point where it was "tolerable" for him. (T. 351).

The record also contains notes from plaintiff's physical therapy sessions from May 20, 2002 until February 7, 2003. (T. 280-90). The plaintiff's discharge summary noted that plaintiff's pain was "unchanged." (T. 280). On February 7, 2003, Physical Therapist Elizabeth Buljonis recommended that plaintiff discontinue physical therapy, and she stated that plaintiff had been given an individualized home exercise program. (T. 280).

The record also contains a report, dated July 15, 2004, from Dr. P. Sebastian Thomas, Director of Pain Treatment Services at the Upstate Medical Anesthesiology

15

Group (Pain Clinic) and Dr. Hasan Berisha. (T. 513-15).  Plaintiff was referred to this group by his physicians at St. Joseph's.  This report indicates that plaintiff's pain was in the lumbar area and radiated down his right leg. (T. 514).  The doctors' assessment was "lumbar radiculopathy." (T. 515).  Plaintiff was scheduled for epidural steroid blocks and was prescribed methadone and oxycodone. (T. 515).

### C. Hutchings Psychiatric Center- Psychiatric Care

In February 1999, plaintiff was hospitalized for an overdose of Amitriptyline. (T. 102, 181).  On March 30, 1999, plaintiff returned St. Joseph's Primary Care Center to see Dr. Bruce Kuntz, one of his primary care physicians at that time. (T. 181).  Dr. Kuntz stated that plaintiff was being examined as a "follow up" to his suicide attempt. *Id.*  Dr. Kuntz stated that plaintiff had been taking the Amitriptyline for his hip pain, and that plaintiff had a history of substance abuse. (T. 181).  Dr. Kuntz stated that plaintiff was "doing fine" since his hospital discharge in March. *Id.*

On March 9, 1999, plaintiff was admitted to Hutchings Psychiatric Center as an outpatient. (T. 248).  Plaintiff  was treated at Hutchings Psychiatric Center (Hutchings) from March 9, 1999 to January 31, 2002. (T. 248-70).  On March 12, 1999, Dr. Sabita Ashutosh, a psychiatrist at Hutchings, completed a psychiatric evaluation and diagnosed plaintiff with major depressive disorder, personality disorder NOS,[18] and noted plaintiff's complaints of pain in his joints stemming from hip

---

[18] Personality disorder NOS is an abbreviation for Personality Disorder Not Otherwise Specified, which is a category for "disorders of personality functioning ...that do not meet criteria for any specific Personality Disorder."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 729 (4th Ed., text revision 2000).

surgery. (T. 268).  Dr. Ashutosh stated that plaintiff had attempted suicide twice

before his February 1999 attempt, (T. 267), that his condition needed "stabilization,"

and Dr. Ashutosh recommended treatment with antidepressants and cognitive

behavior therapy. (T. 269).  Plaintiff then began to attend psychotherapy sessions at

Hutchings Psychiatric Center. (T. 248).

From August 14, 2000 to August 16, 2000, plaintiff was admitted to St.

Joseph's Hospital and placed in the Comprehensive Psychiatric Emergency Program

(CPEP). (T. 208-20).  Plaintiff was a walk-in patient who stated that he had thought

about killing himself by overdosing or by using a knife or gun. (T. 208, 251, 258).

Plaintiff also stated that he had used alcohol on the day of his admission and had used

cocaine the night before. (T. 209, 258).  A few days after his admission to St. Joseph's

Hospital, Plaintiff was transferred to Hutchings inpatient unit, where he remained for

two weeks and was considered "seriously suicidal." (T. 251).

On November 29, 2000, Maxine Block, Ph.D., plaintiff's psychologist at

Hutchings, wrote a report to the Social Security Administration, stating that plaintiff

was still considered a "serious suicide risk," although he was compliant with his

medications at that time. (T. 251).  Plaintiff was "generally pleasant;" his speech

patterns were coherent and logical; he was often extremely depressed, but was

"working on this in treatment;" his recent and remote memory were somewhat

impaired after the overdose; he had some insight into the factors that contributed to his

depression; and although his judgment was erratic, there had recently been more

evidence of appropriate, reasonable judgment. (T. 252).

Dr. Block concluded that plaintiff's depression would hinder him from being able to "successfully comply with demands of a work situation." (T. 251, 253). However, Dr. Block also stated that the doctors were focusing on his depression and hopelessness, and that plaintiff hoped to be able to work "in the future." (T. 253).  Dr. Block also stated that plaintiff had limited understanding, limited concentration and persistence, limited ability to interact socially, and a limited ability to adapt to changes. (T. 254).

In January 2002, plaintiff was "discharged" as an outpatient from Hutchings Psychiatric Center.  (T. 248).  The discharge summary states that plaintiff's original treatment goals involved understanding his depression and its relationship to substance abuse. (T. 249).  Plaintiff initially attended his sessions regularly and participated in "verbal psychotherapy," stating that he was motivated to return to work, but gradually attended less sessions until, at the time of his discharge, plaintiff had not been attending any treatment sessions.  (T. 249).  Plaintiff also stated by telephone at the time of his discharge, that he was "feeling better."  (T. 249).

### D.  St. Joseph's Hospital and Health Center Psychiatric Care

Plaintiff's treating family practice physicians also treated his depression.  Dr. Hales treated plaintiff on June 17, 2003 for his depression and anxiety. (T. 409).  Dr. Hales increased plaintiff's Effexor medication and kept plaintiff on Xanax.  (T. 409).  During this examination, plaintiff told Dr. Hales that he had not engaged in any drug use in fifteen years. (T. 409).  Dr. Hales noted that plaintiff was "awaiting counseling." (T. 409).  Beginning on July 23, 2003, Dr. Yambo diagnosed and treated

18

plaintiff's depression numerous times. (T. 341-42, 344, 351, 362, 370, 383, 393, 398-99).  At the beginning of 2004, Dr. Yambo learned that plaintiff had switched to Prozac and was weaning himself off of Paxil. (T. 370).  Dr. Yambo stated that she learned that plaintiff had an alcohol relapse in July 2003 and that, thereafter, plaintiff has had a couple cans of beer a day.  (T. 370).[19]  On February 12, 2004, Dr. Yambo stated that counseling would help improve plaintiff's mental condition more than medication.  (T. 362).

### E.  Other Medical Conditions

Plaintiff has also been diagnosed with chronic sinusitis. *See e.g.* (T. 346, 348, 357, 360, 394, 408, 412).  Plaintiff also has a history of Hepatitis C. *See e.g.* (T. 177-85).  There are many references to a history of Hepatitis C, and on November 24, 2003, plaintiff told Dr. Kalyani Ganesh during a consultative examination that plaintiff had been diagnosed with Hepatitis C thirteen years ago. (T. 302).  There is one progress note in the record from the St. Joseph's Asthma and Allergy Clinic, dated October 17, 2003, stating that plaintiff had "recently" been diagnosed with COPD (Chronic Obstructive Pulmonary Disease). (T. 394-95).  On November 24, 2003, Dr. Ganesh stated that plaintiff was diagnosed with "emphysema" in 2002. (T. 302).

### F.  Consulting Physicians

Plaintiff has had three consultative examinations.  Dr. Kristen Barry, Ph.D. and Dr. Jeanne Shapiro, Ph.D. each performed a psychiatric evaluation.  Dr. Kalyani Ganesh, an internist, performed two orthopedic examinations.

---

[19]The plaintiff has a history of alcohol abuse.  (T. 370).

On July 20, 2000, Dr. Barry examined the plaintiff and diagnosed him with alcohol and cocaine dependence (both in remission) and a major depressive disorder. (T. 197-202).  During the examination plaintiff stated he had been alcohol- and cocaine-free for six years. (T. 198).  Plaintiff also stated that, since his overdose in 1999, he had voices in his head telling him to commit suicide and that he saw the devil in his bedroom. (T. 198).  The plaintiff also stated that he was taking Paxil, Neurontin and Zyprexa. (T. 198).  Dr. Barry stated that plaintiff's appearance was appropriate; his speech was fluent and clear, presenting adequate expressive and receptive language skills; his thought processes appeared coherent and goal directed, with no evidence of hallucinations, delusions, or paranoia; his affect was "somewhat depressed" and his mood was "mildly restricted." (T. 199-200).  Dr. Barry also stated that plaintiff's attention was intact during the interview, he was able to count and do simple calculations; his recent and remote memory skills were intact; his intellectual functioning was average to low average; his insight was fair; and his judgment was fair, although plaintiff did have a "history" of poor judgment. (T. 200).

Dr. Barry stated that plaintiff was able to follow and understand simple directions and instructions; was able to maintain his attention and concentration; and appeared to be "a fairly intelligent individual." (T. 201).  However, Dr. Barry stated that plaintiff had a difficult time dealing with "stressors," and dealing adequately with others. (T. 201).  Dr. Barry concluded that plaintiff's prognosis was "poor" because he had a suicide attempt in the recent past and stated that he had been having some hallucinations. (T. 201-202).  Dr. Barry also stated that plaintiff had a "history" of

poor judgment, and "may have some difficulty managing his own funds." (T. 202).
Plaintiff told Dr. Barry that he had a difficult time handling money so Dr. Barry stated
that the agency might want to assign a payee. (T. 202).

On November 24, 2003, Dr. Shapiro performed a consultative examination. (T.
308-12). Plaintiff told Dr. Shapiro that he had been raped while he "was in rehab,"
and that he had nightmares about this incident. (T. 309). Plaintiff also stated that he
was depressed, anxious, and did not want to leave the house. (T. 309). Plaintiff stated
that he abused alcohol from the time that he was eighteen and abused cocaine from the
time that he was 34 until he was 40 (seven years prior to Dr. Shapiro's examination).
(T. 309).

Dr. Shapiro stated that plaintiff was cooperative; his speech "intelligibility" was
fluent; his expressive and receptive language were adequate; his thought processes
were coherent and goal directed; his mood was depressed, and he appeared sad. (T.
310). Dr. Shapiro stated that plaintiff's affect was "constricted," and that his attention
and concentration were "intact," but "would probably declined [sic] over a longer
period of time." (T. 310). Plaintiff's recent and remote memory skills were "mildly"
impaired due to the Post Traumatic Stress Syndrome and depression. (T. 310). His
intellectual functioning was borderline, and his general fund of knowledge was
"somewhat limited." (T. 310).

Dr. Shapiro stated that plaintiff could "probably" not consistently attend or
concentrate and that he would have difficulty adequately understanding and following
some instructions and completing tasks due to the attention and memory deficits. (T.

311).  Dr. Shapiro stated that plaintiff would have difficulty interacting appropriately with others, attending work, or maintaining a schedule. (T. 311).  Dr. Shapiro diagnosed plaintiff with posttraumatic stress disorder and depressive disorder.  (T. 311).  Dr. Shapiro connected the posttraumatic stress disorder to plaintiff's statement that he had been raped when he was in "rehab."  (T. 309).

Dr. Kalyani Ganesh examined plaintiff on July 20, 2000 and concluded that plaintiff "does not appear to have gross physical limitation to sitting, standing or the use of his upper extremities."  (T. 205).  Dr. Ganesh did notice a "mild limitation" in plaintiff's ability to walk and climb, but stated that the prognosis "appears stable." (T. 205).

Over three years later, on November 24, 2003, Dr. Ganesh performed a second examination.  Dr. Ganesh again found "no gross limitation" in sitting, standing, or in using the upper extremities.  (T. 305).  Additionally, Dr. Ganesh again found mild limitation to walking and climbing. (T. 305).  During this exam, the plaintiff stated that he had "pain in the right hip all the time."  (T. 302).

### F. Non-Examining Physicians

Four individuals have reviewed plaintiff's record and have each completed a residual function capacity (RFC) assessment.  Dr. Sury Putcha and M. Smith completed physical RFC assessments, while Dr. Thomas Harding, Ph.D. and Dr. Richard Nobel, Psy.D. completed mental RFC assessments.

The only non-examining physician relied upon by the ALJ in his decision was Richard Nobel, Psy.D., an psychologist, who completed a "psychiatric review" and a

mental RFC on January 13, 2004.  (T. 316-29, 330-33).  Dr. Nobel determined that

plaintiff had "mild" limitations on his daily living activities and "moderate"

limitations in maintaining social functioning and maintaining concentration,

persistence or pace.  (T. 326).  Additionally, Dr. Nobel concluded that plaintiff could

work in a position that had simple tasks and in which he did not have to work closely

with others.  (T. 332).

## DISCUSSION

To be considered disabled, a Plaintiff seeking disability insurance benefits or

SSI disability benefits must establish that he is "unable to engage in any substantial

gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than twelve months ...." 42 U.S.C.

§ 1382c(a)(3)(A).  In addition, the Plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national economy, regardless
> of whether such work exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520

and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity.  If he is not, the [Commissioner]

next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; ... . Assuming the claimant does not have listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.

The Plaintiff has the burden of establishing disability at the first four steps. However, if the Plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

## 1.  **Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.

24

In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)(citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

**2.**    **Treating Physician**

The medical conclusions of a treating physician are controlling if well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record.  20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2).  *See also Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998); *Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999).  An ALJ may not arbitrarily substitute his own judgment for competent medical opinion.  *Rosa v. Callahan*, 168 F.3d at 79 (citations omitted).   If the treating physician's opinion is not given "controlling weight," the ALJ must assess the following factors to determine how much weight to afford the opinion: the length of the treatment relationship, the frequency of examination by the treating physician for the condition(s) in question, the medical evidence supporting the opinion, the consistency of the opinion with the record as a whole, the qualifications of the treating physician, and other factors tending to support or contradict the opinion.  20 C.F.R. §§ 404.1527(d)(2-6); 416.927(d)(2-6).  Failure to follow this standard is a failure to apply the proper legal standard and is grounds for reversal. *Barnett v. Apfel*, 13 F. Supp. 2d 312, 316 (N.D.N.Y. 1998)(citing *Johnson v. Bowen*, 817 F.2d at 985).

In this case, plaintiff alleges that the ALJ erred in failing to discuss what weight he gave to Dr. Yambo's "Medical Source Statement of Ability to Do Work-Related Activities"[20] and in failing to give Dr. Yambo's assessment controlling weight.

---

[20] This "Medical Source Statement" is an assessment of plaintiff's physical residual functional capacity. (T. 334-37).  The court will refer to this document as Dr. Yambo's RFC evaluation.

Plaintiff argues that Dr. Yambo's RFC evaluation indicates that plaintiff cannot perform any work in the national economy, and that when the Vocational Expert was given a hypothetical using Dr. Yambo's RFC evaluation, the VE stated that there were no jobs that plaintiff could perform.

The court first notes that the ALJ **did discuss** Dr. Yambo's opinion in his decision and specifically determined that Dr. Yambo's February 2004 RFC evaluation was **not** supported by other substantial evidence in the record, nor was it supported by Dr. Yambo's own treatment notes. (T. 20-21).  Dr. Yambo's RFC evaluation stated that plaintiff could occasionally and frequently lift ten pounds, could stand for less than two hours in an 8-hour workday, could sit for less than six hours in an 8-hour workday, and would have limited pushing and pulling ability with his lower extremities. (T. 335).[21]  Dr. Yambo also stated that plaintiff could occasionally climb and frequently balance, kneel, crouch, crawl and stoop.  (T. 335).

The ALJ found that Dr. Yambo's own treatment records do not support her February 2004 RFC evaluation.  Dr. Yambo's examination notes from July 2003, December 2003, February 2004, and March 2004 do not indicate any evaluation of plaintiff's **physical** limitations. (T. 351, 357, 362, 378, 398).  On July 23, 2003, Dr. Yambo stated that plaintiff was suffering from depression, some anxiety, fatigue and weight loss. (T. 398).  On December 31, 2003, Dr. Yambo stated that plaintiff was

---

[21]The court notes that Dr. Yambo determined that plaintiff could occasionally and frequently lift ten pounds.  In plaintiff's brief, plaintiff's counsel repeatedly states that Dr. Yambo determined that plaintiff could **not** lift ten pounds frequently or occasionally.  No physician in the record found such a limitation.

"following up" for his fatigue and depression. (T. 378).

On February 12, 2004, Dr. Yambo stated that plaintiff was "following up" for his depression. (T. 362). Dr. Yambo also noted that plaintiff might have had sinusitis, but did not mention anything about plaintiff's physical limitations. (T. 362). On March 30, 2004, Dr. Yambo stated plaintiff was seeing her for his depression. (T. 351). The February 2004 RFC is also contradicted by Dr. Yambo's two treatment reports that state she was *not treating plaintiff's hip pain* and that plaintiff should discuss his hip pain medication with "orthopedics." (T. 379, 393). Since Dr. Yambo was not treating plaintiff's hip or his hip pain, it is unclear upon what *clinical findings* she was relying to make the assessment of his physical capabilities.

Additionally, the ALJ found that Dr. Yambo's February 2004 RFC was contradicted by other substantial evidence in the record. Dr. Robinson, a treating orthopedic specialist, examined plaintiff in December 2003, two months before Dr. Yambo's RFC evaluation. Dr. Robinson found no swelling or erythema, and found that plaintiff's range of motion was "good" with "minimal discomfort." (T. 387). Additionally, the ALJ notes that less than three months after Dr. Yambo's RFC, Dr. Eaton performed a physical examination of the plaintiff and found plaintiff had "full range of motion with no pain to movement" and no gross deformities. (T. 455). Dr. Eaton found, instead, that plaintiff was exhibiting "drug seeking behavior." (T. 455-456).

The ALJ also relied on Dr. Ganesh's November 24, 2003 examination in determining plaintiff's RFC. (T. 20). Dr. Ganesh performed her second examination

of plaintiff on November 2003.  Dr. Ganesh found virtually the same limitations as she found after her examination of plaintiff in July of 2000.  Dr. Ganesh's November 2003 examination found "no gross limitation" in sitting, standing, or in using the upper extremities. (T. 305).  Additionally, Dr. Ganesh found "minimal to mild limitation to walking and climbing." (T. 305).

The ALJ also based his decision about Dr. Yambo's February 2004 medical source statement, in part, on plaintiff's lack of credibility.  The ALJ determined that plaintiff was "*not entirely credible*" because of inconsistencies between his statements and other substantial evidence in the record.  (T. 19).  The ALJ noted numerous inconsistencies; including: (1) plaintiff's statement that he had been drug and alcohol free for six years when, a month later, plaintiff was admitted to the hospital stating that he drank the day of his admission and had used cocaine the night before, (T. 198, 209, 258); (2) plaintiff's collection of unemployment compensation due to the seasonal roofing work (T. 125); (3) plaintiff's ability to shovel snow off a roof and to continue to work as a roofer during the time when plaintiff contends he had pain, confusion, depression, and fatigue (T. 291); and, (4) plaintiff's inconsistent statements about whether he was "raped" in "jail" or in "rehab."[22]  (T. 309, 370).  The ALJ also determined that plaintiff was "not entirely credible" because of plaintiff's "drug seeking behavior."  (T. 456).  Based partly upon Dr. Eaton's diagnosis and description of plaintiff's "angry" actions and "vulgar" language on May 10, 2004 when he was

---

[22]  This inconsistency shed doubt upon whether plaintiff had been "raped" at all, and this alleged "trauma" was part of the basis for Dr. Shapiro's diagnosis of PTSD. (T. 309).

refused Vicodin, the ALJ determined that plaintiff was abusing his prescription drugs.

Because of the ALJ's determination that plaintiff was "***not entirely credible***," the ALJ decided to reject "medical findings or opinions based solely or primarily on claimant's ***subjective complaints***." (T. 20)(emphasis added). The ALJ found that Dr. Yambo's medical findings and February 20, 2004 RFC evaluation were substantially based on plaintiff's subjective complaints, and those findings were thus discredited by the ALJ. (T. 20).

Plaintiff alleges that the only reason given by the ALJ for not giving controlling weight to Dr. Yambo's 2004 medical source statement is that Dr. Yambo did not treat plaintiff extensively. The ALJ never states that Dr. Yambo has not treated plaintiff extensively. Instead, the ALJ states that Dr. Yambo's treatment notes are "minimal." (T. 21).

Given the reasons cited by the ALJ, the ALJ's rejection of Dr. Yambo's physical RFC was supported by substantial evidence. The ALJ relied upon the opinions of other treating and examining physicians, the objective medical record, and the plaintiff's credibility in determining what weight to give to Dr. Yambo's medical reports.

**3.    <u>Pain</u>**

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v.*

*Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999)(quoting *Gallardo v. Apfel*, No. 96

CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)).  To satisfy the

substantial evidence rule, the ALJ's credibility assessment must be based on a two

step analysis of pertinent evidence in the record.  *See* 20 C.F.R. §§ 404.1529, 416.929;

*see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y.

March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical

evidence, whether the medical impairments "could reasonably be expected to produce

the pain or other symptoms alleged...."  20 C.F.R. §§ 404.1529(a), 416.929(a).

Second, if the medical evidence alone establishes the existence of such impairments,

then the ALJ need only evaluate the intensity, persistence, and limiting effects of a

claimant's symptoms to determine the extent to which it limits the claimant's capacity

to work. *Id.* §§ 404.1529(c), 416.929(c).

When the objective evidence alone does not substantiate the intensity,

persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the

credibility of the claimant's subjective complaints by considering the record in light of

the following symptom-related factors: (1) claimant's daily activities; (2) location,

duration, frequency, and intensity of claimant's symptoms; (3) precipitating and

aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication

taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any

measures taken by the claimant to relieve symptoms; and (7) any other factors

concerning claimant's functional limitations and restrictions due to symptoms.  *Id.* §§

31

404.1529(c)(3), 416.929(c)(3).

Plaintiff claims in a conclusory fashion that the ALJ failed to properly analyze the pain endured by plaintiff.  Plaintiff's brief argues that plaintiff's pain may not be rejected simply because objective clinical findings do not establish a cause for the pain and then cites plaintiff's alleged conditions[23] and plaintiff's testimony that he "aches" and must lie down during the day. (T. 544).

First, the court notes that the ALJ did not reject plaintiff's complaints of pain simply based upon the lack of "objective clinical findings."  The ALJ recognized that plaintiff suffers from multiple impairments. (T. 17).  In fact, the ALJ carefully reviewed plaintiff's impairments and how they affected his physical *and mental abilities* in determining that plaintiff could not perform the full range of light work, "giving the claimant the maximum benefit of the doubt regarding his subjective complaints." (T. 21).  The ALJ found that plaintiff had pain, but not to the extent he claimed. (T. 19).

The ALJ relied upon the opinions of the physicians, the plaintiff's testimony, and he determined that plaintiff was "not entirely credible."  (T. 19).  The ALJ based his credibility finding upon many inconsistencies between plaintiff's statements to

---

[23]Plaintiff's counsel asserts that "plaintiff has coronary artery disease, emphysema, hypertension, herniated discs, hiatal hernia and sleep apnea."  (Plaintiff's Brief 10).  The court notes that these conditions do not comport with what the plaintiff alleges *in this case*.  This plaintiff alleges that he suffers from chronic bursitis of the right hip, arthritis of the spine, Hepatitis C, chronic sinusitis, chronic depression and anxiety, emphysema, and complications from plaintiff's medications.  (T. 138).  It is unclear where plaintiff's counsel obtained the conditions that she lists on page 10 of the brief.  There is absolutely *no evidence* that plaintiff has coronary artery disease, herniated discs or sleep apnea, and counsel has not mentioned plaintiff's bursitis in this list.

various doctors and based upon plaintiff's own statements about the activities that he was performing during the entire period that he was claiming to be disabled.  The ALJ noted that in February of 2003, plaintiff went to the emergency room because ***he fell off the roof while shoveling snow***, injuring his left hand. (T. 19).  The ALJ correctly stated that a person with such severe complaints of pain would not be shoveling snow, "much less on a roof." (T. 19).

The ALJ also commented on the fact that plaintiff stated that he worked as a roofer during some of the period that he was supposed to be disabled, although stating that he could only be used as a nailer.  The ALJ correctly stated that this activity did not comport with plaintiff's claims of disabling pain.  Based on these and other inconsistencies, the ALJ determined that he would not accept medical findings or opinions that were "based solely or primarily on claimant's subjective complaints."

Finally, the ALJ also noted that plaintiff's doctors suspected that plaintiff was abusing his prescription drugs.  It is clear from the record that plaintiff appeared frequently just to obtain medication and as cited above, his doctors began to refuse to prescribe him certain medications.  The ALJ noted that in May of 2004, plaintiff requested additional Vicodin, while claiming at the same time that he did not have any back pain.

Despite the ALJ's determination that the plaintiff was "not entirely credible," the ALJ gave the plaintiff the "maximum benefit of doubt regarding plaintiff's subjective claims."  The ALJ determined that plaintiff could perform a range of light work, but required a sit/stand option and could only require walking on level or even

surfaces, perform all postural movements occasionally, except climbing ladders, ropes, or scaffolds. These limitations were greater than those outlined by the non-examining physicians and even Dr. Ganesh, and demonstrate that the ALJ did take account of plaintiff's subjective complaints. Thus, the ALJ's analysis of plaintiff's pain is supported by substantial evidence.

## 4. **Hypothetical Question**

Plaintiff also argues that the ALJ erred in failing to utilize Dr. Yambo's RFC when determining whether plaintiff could perform other work in the national economy. If a claimant is unable to perform a full range of a particular exertional category of work, has substantially limiting non-exertional impairments, or the issue is whether a claimant's work skills are transferable to other jobs, the ALJ may utilize the services of a Vocational Expert (VE). 20 C.F.R. §§ 404.1566, 416.966. A VE may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations. *See Rautio v. Bowen*, 862 F.2d 176, 180 (8th Cir. 1988); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

Although the ALJ is initially responsible for determining the claimant's capabilities based on all the evidence,[24] a hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational expert testimony. *See De Leon v. Secretary of Health and Human Services.*, 734 F.2d 930, 936 (2d Cir. 1984); *Lugo v. Chater*, 932 F. Supp. 497, 503-04 (S.D.N.Y. 1996).

---

[24] *Dumas*, 712 F.2d at 1554 n.4.

34

The Second Circuit has stated that there must be "substantial record evidence to support the assumption upon which the vocational expert based [her] opinion." *Dumas*, 712 F.2d at 1554. *See also Renna v. Barnhart*, 02-CV-765, 2003 U.S. Dist. LEXIS 7402 *10 (E.D.N.Y May 2, 2003)(citing *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983); *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981)).

Because this court has found that the ALJ in this case properly discounted the medical source statement submitted by Dr. Yambo in 2004, the ALJ was correct in failing to utilize the limitations listed in that statement as a basis for his hypothetical question to the VE.  A review of the hypothetical question shows that the ALJ considered, and included, the plaintiff's additional physical and mental limitations in his question to the VE. (T. 548-49).

## 5. **Substantial Evidence**

Plaintiff claims that the ALJ's decision is not based on substantial evidence. Plaintiff contends that the ALJ ignored the medical evidence of Dr. Yambo and imposed his own restrictions based upon his interpretation of the evidence. Dr. Yambo's treating reports, the opinions of other physicians; including Dr. Robinson, Dr. Eaton, Dr. Ganesh, and Dr. Putcha, and the objective medical reports provide substantial evidence upon which to render a decision.

Having reviewed the entire record, this Court finds that substantial evidence does exist within the transcript to support the ALJ's decision.

**WHEREFORE,** based on the findings in this order, it is hereby

**RECOMMENDED,** that the decision of the Commissioner be **AFFIRMED**

and the complaint (Dkt. No. 1) be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten

days within which to file written objections to the foregoing report.  Such objections

shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS**

**REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health*

*and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ.

P. 6(a), 6(e), 72.

Dated: July 20, 2006

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge